## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

ANGELA MICHELLE H.,[1]                        )
                                              )
      Plaintiff,                        )
                                              )
vs.                                           )   Case No. 3:23-cv-2666-DWD
                                              )
MARTIN O'MALLEY, Commissioner                 )
of Social Security,                           )
                                              )
      Defendant.                        )

### MEMORANDUM & ORDER

**DUGAN, District Judge:**

Pursuant to 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision, denying Plaintiff's application for Supplemental Security Income ("SSI"). For the reasons explained below, the Court **AFFIRMS** the final agency decision of Defendant. The Clerk is **DIRECTED** to enter judgment for Defendant and against Plaintiff.

### I.      Procedural History

Plaintiff was born on February 22, 1973. (Doc. 11-5, pg. 5). She applied for SSI benefits under Title XVI of the Social Security Act on August 11, 2020, alleging a disability onset date of July 28, 2020. (Doc. 11-6, pg. 61). Plaintiff's alleged disability is related to schizoaffective disorder, obesity, degenerative changes of the right knee, and left shoulder labral repair. (Doc. 11-2, pg. 32). The claim was denied initially and on reconsideration. Plaintiff sought a hearing, which was held on October 19, 2021, before

---

[1] In keeping with the Court's practice, Plaintiff's full name will not be used in this Memorandum & Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

an Administrative Law Judge ("ALJ"). (Doc. 11-4, pg. 18; 11-2, pg. 30). An Unfavorable Decision was issued to Plaintiff on January 4, 2023. (Doc. 11-2, pgs. 27-47). The Appeals Council denied a request for review in a decision dated June 20, 2023. (Doc. 11-2, pgs. 2-8). Accordingly, Plaintiff has exhausted her administrative remedies, and he ALJ decision is now ripe for judicial review.

## II.     Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in preparing this Memorandum & Order. The following summary of the record is directed to the points raised by Plaintiff.

### A. Administrative Hearing

The evidentiary hearing was held on May 31, 2022. (Doc. 11-2, pg. 50). Plaintiff appeared in person and was represented by attorney Jennifer Van Fossan. (*Id*.).

#### 1. *Plaintiff's Testimony*

During the hearing, Plaintiff testified to the following: Plaintiff is living with her husband and has medical coverage through the Public Aid office. (Doc. 11-2, pg. 54). But she could not obtain some of her medications because they were not covered by public aid. (Doc. 11-2, pg. 55).

She applied for benefits in July of 2020 because she was hallucinating and depressed. (Doc. 11-2, pg. 54). Because of this, she began seeing a psychiatrist for paranoid schizophrenia, post-traumatic stress disorder, and depression. (*Id*.). When Plaintiff hallucinates, she "see[s] things horrible things sometimes." (Doc. 11-2, pg. 55). Her hallucinations are "horrible and frightening" and cause nightmares. (Doc. 11-2, pg.

2

68). These visions make her suspicious and paranoid. (Doc. 11-2, pgs. 68-69). As a result, it is difficult to work with people or to leave home. (*Id.*). When Plaintiff worked, she felt like she needed to get away from people, and she had auditory hallucinations all the time. (Doc. 11-2, pgs. 69-71).

Plaintiff anxiety, and her mental health problems sometimes keep her in bed all day. (Doc. 11-2, pg. 70-71). She has trouble sleeping and focusing, is sluggish throughout the day, falls asleep unexpectedly, and struggles to concentrate. (Doc. 11-2, pgs. 55, 58-61, 67). Plaintiff cannot concentrate on one thing for more than 15 minutes. (Doc. 11-2, pg. 67).

Plaintiff suffers from tardive dyskinesia. (Doc. 11-2, pg. 72). She has tremors and involuntary movements. (*Id.*). It causes her to drop things. (*Id.*). The tardive dyskinesia is caused by her "mental issues" and "medication." (*Id.*). The shakes and tremors are "always there," and involuntary movements happen several times during the day. (*Id.*). She takes Benzatropine to control these symptoms. (Doc. 11-2, pg. 73).

Plaintiff has problems with her back, neck, leg, right knee, and left shoulder. (Doc. 11-2, pgs. 55-65). Issues with her leg and right knee became evident when she was working as a delivery driver for Domino's. (Doc. 11-2, pg. 56). Her leg and knee started "acting up," and the knee swelled up. (*Id.*). Eventually, an orthopedic doctor operated on her leg. (*Id.*). Her doctors advised her that there is nothing more they can do for her. (*Id.*) She will need physical therapy and pain management. (*Id.*). The purpose of physical therapy is to strengthen her hip and give her some additional time before the knee injury begins to impact her hip. (*Id.*).

3

She is walking with a cane and cannot stand for long periods of time because her knee locks up and gives out.  (Doc. 11-2, pgs. 56, 61-63, 66-67). She cannot sit for more than about an hour and a half before [she has] to get up and change positions." (Doc. 11-2, pgs. 62-63). But if she is experiencing a lot of pain, she needs to change positions every twenty minutes. (Doc. 11-2, pg. 65). There are also times when Plaintiff needs to change positions every "few minutes" (Doc. 11-2, pg. 74-75).

Plaintiff injured her left shoulder while working at a nursing home. (Doc. 11-2, pgs. 57, 62). Because of this injury, she received workers compensation and was considered partially disabled. (*Id*.). She does not have the same strength "or anything" in her left arm and shoulder. (*Id*.). After "a lot" of physical therapy for her left arm and shoulder, Plaintiff's doctor released her. (Doc. 11-2, pg. 59). But Plaintiff later returned to the doctor because she could not, for instance, lift a mop bucket to empty it. (*Id*.). She continues to have pain in her left shoulder. (Doc. 11-2, pg. 63). She struggles to lift things, and she "definitely" cannot lift more than ten pounds. (Doc. 11-2, pg. 65).

Because of her physical and mental disabilities, she is no longer able to work at Domino's, as a housekeeper, or in a warehouse. (Doc. 11-2, pgs. 55-60). Plaintiff cannot cook or do any work around the house. (Doc. 11-2, pgs. 79-81). Her husband stays home with her and takes care of everything, including her. (*Id*).

### 2. *Vocational Expert*

At the hearing, vocational expert ("VE"), Vanessa May, testified. Prior to testifying, the ALJ noted that Plaintiff's consultative examination scheduled for November 2021 was cancelled for unknown reasons. (Doc. 11-2, pgs. 87-91). The ALJ

indicated she would schedule a consultative examination sometime after the hearing. (*Id*.). The VE then considered a hypothetical. (Doc. 11-2, pgs. 92-). The individual in the hypothetical was described as being Plaintiff's age with Plaintiff's education and past work. The VE was asked to assume the individual had no exertional limits, could understand, remember, and apply simple and detailed but not complex information, could carry out simple tasks, could maintain ordinary pace and persistence, could make simple decisions, could manage ordinary changes in routine/work setting, could maintain occasional interaction with coworkers and the public, and could tolerate ordinary supervision. (Doc. 11-2, pg. 92).

The VE opined that such an individual could perform Plaintiff's past work as a housekeeper or warehouse employee, but the individual could not continue any fast-food work, cashier work, or delivery driving. (Doc. 11-2, pg. 93). She further opined that such an individual had the ability to engage in other work existing in significant numbers in the national economy. (*Id*.).

The ALJ presented a second hypothetical. (*Id*.). The second hypothetical included all the mental health restrictions from the first hypothetical. (*Id*.). The VE was then asked to assume the individual (1) could perform a range of light work except never climb ladders, ropes, and scaffolds; (2) could occasionally climb ramps and stairs, stoop kneel, crouch, and crawl, (3) could occasionally reach overhead bilaterally, and (4) could only be occasionally exposed to hazards. (*Id*.). The VE opined that such an individual could perform jobs existing in the national economy. (Doc. 11-2, pgs. 93-95).

B. **Relevant Medical Records**

1. *Mental Health Records*

Between July 2019 and June 2022, Plaintiff received treatment for schizoaffective disorder (depressive type), insomnia, trauma, jerky body movements, grief, and restless leg syndrome. (Doc. 11-7, pgs. 138, 141, 144, 147, 152, 155, 159, 167, 279, 283, 288, 295, 632, 635, 638, 643, 647). During this time, Plaintiff reported difficulty falling asleep and staying asleep, varying levels of depression and anxiety, difficulty concentrating, visual and auditory hallucinations, paranoia, and difficulty interacting with others. (Doc. 11-7, pgs. 137, 140, 143, 146, 149, 150, 154, 158, 162, 166, 278, 282, 286, 290, 294, 627, 631, 634, 637, 642, 646). In some instances, Plaintiff reported certain medications were not helping and that her symptoms were not improving. (*Id*). However, the record indicates that Plaintiff's symptoms improved and were manageable with certain medications, so long as Plaintiff consistently took those medications. (*Id*).[2] In addition, notations in the medical record consistently indicate that Plaintiff's cognitive functions (including memory, level of orientation, attention, and concentration) were intact. (Doc. 11-7, pgs. 138, 141, 144, 147, 152, 155, 159, 167, 279, 283, 288, 295, 632, 635, 628, 638, 643, 647).

The record further indicates that, despite Plaintiff's reported psychological

---

[2] *See also* e.g, (Doc. 11-7, pg. 278) ("I think the Latuda is helping because my hallucinations and voices have died down a lot and [are] not as bad); (Doc. 11-7, pg. 278) (Plaintiff reports "she feels she is able to focus better at work but [when] she doesn't have anything to do is more distracted); (Doc. 11-7, pg. 286) (Plaintiff reports that she "has been out of her medications for 2 months…she felt they were helping when she was taking them but since being out auditory hallucinations have returned."); (Doc. 11-7, pg. 631) (after stopping, Plaintiff sought to resume taking medication, reporting that "the medication was helping with her hallucinations but her sleep was still a problem," that "Gabapentin helped with restless leg symptoms," and that her depression "wasn't all the way gone but the medication did help.").

symptoms, she was able to maintain employment. For example, on May 25, 2021, Plaintiff reported she was working as a delivery driver at Domino's Pizza, she was able to stay focused at work, and that "staying busy at work" was beneficial. (*Id*).  (Doc. 11-7, pg. 278). On January 18, 2022, Plaintiff stated she could no longer work due to having two recent surgeries. (Doc. 11-7, pg. 631). She did not indicate that psychological symptoms contributed to her inability to work at that time.

On April 4, 2022, Plaintiff was examined at Heartland Rural Healthcare, complaining of shortness of breath (dyspnea on exertion). (Doc. 11-7, pg. 327). At that time, Plaintiff reported "no depression and no sleep disturbances." (Doc. 11-7, pg. 331). As to Plaintiff's psychiatric condition, the examiner indicated she was alert and oriented, with intact judgment and insight. (Doc. 11-7, pg. 332). The examiner did not observe any memory issues. (*Id*.). In May 2022, at a follow-up and wellness examination, Plaintiff reported that, with her psychiatric medications, her mood was stable. (Doc. 11-7, pg. 338). The healthcare provider also noted as follows: "no depression, no anxiety, and no thoughts of suicide; controlled on meds from psychiatry." (*Id*.).

## 2. *Left Shoulder Injury*

On October 13, 2020, Plaintiff alleged a worker's compensation injury to her left shoulder. (Doc. 11-7 pgs. 616-625). Plaintiff indicated that, while working for University Nursing and Rehabilitation as a housekeeper, she injured her left shoulder when she was putting a heavy trash bag in the dumpster. (*Id*). On December 30, 2020, Plaintiff underwent diagnostic arthroscopy to repair a left shoulder traumatic posterior labral tear. (Doc. 11-7, pg. 197-200). Following the procedure, the surgeon estimated that Plaintiff

would be able to return to normal unrestricted activities in 3-6 months and would reach maximum medical improvement in 4-8 months. (Doc. 11-7, pg. 200).

On April 21, 2021, at a follow-up visit with Orthopedic Associates, Plaintiff reported feeling "very good." (Doc. 11-7, pg. 599). She reported experiencing pain and a stretching feeling following strenuous activity but indicated these symptoms occurred "rarely" and were "mild." (*Id.*). For instance, Plaintiff told the physician that she experienced "some aching pain for 2-3 days after she and her husband moved," but she was able to "carry heavy items without difficulty." (*Id.*).

The physician also noted that the "pertinent negatives" of Plaintiff's condition included "decreased mobility, nocturnal awakening, joint instability, and tingling in the arms." (*Id.*). Plaintiff also indicated she wanted to stop attending physical therapy appointments. (*Id.*). The physician released Plaintiff to return to work without restrictions. (Doc. 11-7, pgs. 604; 606).

On May 12, 2021, Plaintiff returned to Orthopedic Associates for another follow-up visit. (Doc. 11-7, p. 607). Plaintiff indicated she was able to return to work at the nursing home, and although she experienced some aching in her shoulder at the end of the day, she was able to perform her work duties. (*Id.*). She also stated that she started a second job delivering pizzas for Dominos. (*Id*). She reported that she felt "ready to be released and move on from [her] injury." (*Id*). The treating physician concluded Plaintiff had reached maximum medical improvement and released her from his care without permanent restrictions. (Doc. 11-7, p. 612).

8

### 3. *Back Pain, Right Knee Injury, and Use of a Cane*

Plaintiff is obese with a BMI range between 36 and 40. (Doc. 11-7, pgs. 212, 327; Doc. 27, pg. 153). The medical records indicate Plaintiff was occasionally observed using a cane. Nonetheless, Plaintiff's gait is consistently described as normal and not antalgic. (Doc. 11-7, pg. 138) (gait described as normal during visit on July 30, 2019); (Doc. 11-7, pg. 212) (in December 2020, the examiner observed normal balance and gate and normal coordination); (Doc. 11-7, pg. 344) (at a visit in February 2022, use of a cane is noted, and the examiner observed normal gait and station and normal motor strength); (Doc. 11-7, pgs. 324, 332) (at two visits in April 2022, the treating physician noted left cane use, normal gait, normal range of motion, normal tone, no tenderness, and no atrophy); (Doc. 11-7, pg. 338) (during a medical visit in May 2022, the examiner noted Plaintiff was ambulatory with use of a cane and observed normal movement of all extremities, normal gait, and normal motor strength); (Doc. 26, pg. 29) (at a pain management consult in June 2022, the examiner noted Plaintiff's use of a cane, but observed her gait was not antalgic, and that there was no steppage gait, no Trendelenburg gait, and no circumspected gait pattern. Her heel walk, toe walk, and tandem gait were described as normal).

At times, Plaintiff reported experiencing chronic back pain. (*see* e.g., Doc. 27, pgs. 26, 121; Doc. 11-7 pg. 6). Plaintiff underwent remote imaging due to her alleged back pain in 2017. The results reflected only mild facet arthropathy without significant degenerative disc disease. (Doc. 11-7, pg. 7).

On August 2, 2019, Plaintiff was seen by Dr. Hsieh for a medication refill, hand problem, and cyst inside of her left index finger. (Doc. 11-7, pg. 59). During that visit,

Plaintiff reported she was applying for social security disability benefits because she could not stand to walk, bend or lift, and because of her psychological issues. (*Id*.). Plaintiff also reported having chronic back pain and a herniated disc, and she requested narcotics. (Doc. 11-7, pg. 63). Dr. Hsieh did not prescribe narcotic pain medication. (*Id*). Instead, he referred Plaintiff to pain management, noting that Plaintiff's 2017 MRI reflected only mild degenerative change and did not reflect a herniated disc as Plaintiff had claimed. (*Id*). Dr. Hsieh also wrote a prescription for a cane, apparently based on Plaintiff's self-reported chronic low back pain. (Doc. 11-7, pgs. 63, 93).

On June 17, 2020, during a visit for pain in her right index finger, Plaintiff reported that she was "disabled because of her back." (Doc. 11-7, pg. 89). The treatment provider noted Plaintiff "uses a cane." (*Id*). Other than this self-report, the Court did not locate any medical records indicating Plaintiff was disabled due to her back.

That same day, at an examination for heel pain, Plaintiff self-reported that she utilizes a cane when walking due to back issues. (Doc. 11-7, pg. 83). The treatment provider indicated that Plaintiff was ambulatory with the cane and diagnosed Plaintiff with plantar fasciitis. (Doc. 11-7, pgs. 82, 86).

On June 23, 2020, Plaintiff was again seen by Dr. Hsieh. (Doc. 11-7, pg. 14). Dr. Hsieh's notes reiterate that, despite Plaintiff's allegations of chronic back pain and a herniated disc, Plaintiff's 2017 imaging reflects only mild degenerative change and no herniated disc. (Doc. 11-7, pg. 17). Dr. Hsieh indicated that Plaintiff would be referred to pain management. (*Id*.).

In August 2020, Plaintiff had additional imaging completed at Gateway Regional

Medical Center. (Doc. 11-7, pg. 129). The results were unremarkable and showed no evidence of central or neural foraminal stenosis and no evidence of focal disc protrusion. (*Id.*).

On July 16, 2021, Plaintiff saw a physician for right knee pain. (Doc. 11-7, pgs. 492-94). She reported she injured her knee while working as a delivery driver. (Doc. 11-7, pg. 494). Plaintiff indicated she had been having symptoms of locking/catching in her knee for approximately a year and that the recent injury worsened her symptoms. (*Id*). Plaintiff filed a worker's compensation claim in connection with this injury. (*Id*).

In October 2021, Paul Scherer completed a diagnostic arthroscopy of Plaintiff's right knee. (Doc. 11-7, pg. 425). The goal was to remove small calcified loose bodies in the right knee. (*Id.*). During the procedure, two "very small" loose bodies were observed, but they were too small to remove. (Doc. 11-7, pg. 426). Nine days after the right knee arthroscopy, Plaintiff followed up with Dr. Thomas Zaiz. (Doc. 11-7, pg. 513). Dr. Zaiz described Plaintiff as "up and walking," "not using a cane or walker," and "comfortable." (Doc. 11-7, pg. 515).

In November 2021, Plaintiff returned to see Dr. Scherer. (Doc. 11-7, pg. 519). At this visit, she reported that due to knee pain she was using a cane again. (Doc. 11-7, pg. 521). She also claimed that at times she felt as if her "knee wants to buckle and give way." (*Id*). The physician concluded she was suffering from "severe anterior knee pain syndrome." (*Id*). Her chief complaint was "pain, locking, catching, giving way in her right knee" (Doc. 11-7, pg. 414). She was instructed to use her cane in her left hand to alleviate

right knee pain. (Doc. 11-7, pg. 417).

In December 2021, Plaintiff presented at physical therapy with right knee pain. (Doc. 11-7, pg. 413). The treatment provider described her as having gait deviations. (*Id*)

In April 2022, the treatment provider indicated Plaintiff used a left cane and described her as having normal gait and station, normal range of motion, normal tone, and manual muscle testing of 5/5, without tenderness or atrophy. (Doc. 27, pgs. 71, 79).

In May 2022, Plaintiff indicated she stopped attending physical therapy because she was ill. (Doc. 11-7, pg. 534). She reported she was still having significant knee pain. (*Id*.).

At medical visits in June 2022, Plaintiff was observed using a cane, but her gait and station were consistently described as normal. *See* e.g., (Doc. 11-7, pg. 43) (describing Plaintiff as having normal gait); (Doc. 27, pg. 61) (Plaintiff was observed using a cane, treatment provider described Plaintiff as having normal gait and station, normal range of motion, normal tone, and manual muscle testing at 5/5, without tenderness or atrophy; (Doc. 27, pgs. 27-29) (treatment provider noted Plaintiff's use of a cane and described Plaintiff's gait as not antalgic, with no steppage, Trendelenburg or circumspected gait pattern. Treatment provider further noted Plaintiff's heel walk, toe walk, and tandem gait were normal).

The records include an order form, signed by Nurse Practitioner Laurie Hopper on July 25, 2022, for a wheelchair. (Doc. 27, pg. 137). The order form states the applicable diagnosis is "unsteady when walking" and "abnormalities of gait and mobility." (*Id*). There are no other records indicating that Plaintiff required a wheelchair or was ever

observed using a wheelchair.

### 4.  *Additional Impairments*

In addition to the above, the medical records indicate Plaintiff has received treatment for the following conditions: Dupuytren's contracture left index finger, plantar fasciitis, COPD, sleep disorder breathing, overactive bladder and stress incontinence, peripheral neuropathy, migraines, chronic bilateral otitis media, left deviated septum, and cataracts. (Doc. 27, pgs. 5-20, 40-87, 155-165; Doc. 11-7, pgs. 48-69, 77-87, 89-90, 116-121; 318-326, 330-343, 547, 618, 654-663).

## C.  Consultative Examinations

### 1.  *State Agency Psychologist M.W. DiFonso, Psy.D.*

State agency reviewing psychologist M.W. DiFonso, Psy.D., (September 2020) concluded Plaintiff's memory, concentration, and social interaction abilities were moderately limited or not significantly limited. (Doc. 11-3, pgs. 78-84). Dr. DiFonso concluded Plaintiff could complete simple one-two step as well as multiple step tasks. (Doc. 11-3, pg. 83). He also found Plaintiff's adaptive skills to be within normal limits. (*Id*.). The only relevant record available at the time of Dr. DiFonso's review was dated August 26, 2020.

### 2.  *State Agency Reviewing Physicians Frank Mikell, M.D., and Kathryn Schutt-Kinnear, M.D.*

State agency reviewing physicians Frank Mikell M.D. (February 2021), and Kathryn Schutt-Kinnear, M.D. (October 2021), found insufficient information in Plaintiff's file to assess Plaintiff's claim. (Doc. 11-3, pgs. 72-77, 87-96). The reviewing

physicians noted that Plaintiff to attend the scheduled consultative examination and did not submit imaging of her knees. (*Id.*).

### 3. *State Agency Psychologist Richard J. Hamersma, Ph.D.*

State Agency reviewing psychologist Richard J. Hamersma, Ph.D., (October 2021; reconsideration level) concluded Plaintiff's memory, concentration, and social interaction abilities were moderately limited or not significantly limited. (Doc. 11-3, pgs. 96-102). Dr. Hamersma concluded Plaintiff could complete simple one-two step as well as multiple step tasks. (Doc. 11-3, pg. 102). He found Plaintiff's adaptive skills to be within normal limits. (*Id.*). Dr. Hamersma indicated he reviewed records ranging from October 2020 through May 2021.

### 4. *Consultative Examination – Dr. Raymond Leung, M.D.*

In August 2022, Plaintiff completed a consultative examination with Dr. Raymond Leung, M.D. (Doc. 27, pgs. 139-142). During the examination, Dr. Leung observed normal memory, affect, dress/hygiene, and cooperation. (Doc. 27, pg. 140). Dr. Leung noted that Plaintiff presented with a cane, but she was able to walk 50 ft, unassisted, with a "minimal limp." (Doc. 27, pg. 141). Plaintiff was able to tandem walk, heel walk, and toe walk. (*Id.*). Dr. Leung indicated Plaintiff had decreased range of motion in her right knee and spine, but she had full range of motion at her shoulders and lumbar spine. (*Id.*). The examination also showed positive straight leg raise. (*Id.*).

Dr. Leung noted decreased breath sounds, but no rales, rhonchi, or wheezes. (Doc.

27, pg. 141). Additionally, Dr. Leung concluded Plaintiff was not in respiratory distress. (*Id*).

### III.   General Legal Standards

To qualify for SSI, a claimant must be disabled. To assess an alleged disability, the ALJ employs a "five-step sequential evaluation process." *See* 20 C.F.R. §§ 404.1520(a)(1), (2), (4); 416.920(a)(1), (4). The ALJ asks whether: (1) the claimant is doing substantial gainful activity; (2) the claimant has a severe medically determinable physical or mental impairment that meets certain duration requirements or a combination of impairments that is severe and meets the duration requirements; (3) the claimant has an impairment that meets or equals one of the impairments listed in the regulations and satisfies the duration requirements; (4) in view of the claimant's RFC and past relevant work, he can perform past relevant work; and (5) in view of the claimant's RFC, age, education, and work experience, he can adjust to other work. *See* 20 C.F.R. §§ 404.1520(a)(4)-(g); 416.920(a)(4)-(g); *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

If the claimant is doing substantial gainful activity under step 1, does not have an impairment or combination of impairments as described at step 2, can perform past relevant work under step 4, or can adjust to other work under step 5, then the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(i),(ii), (iv), (v); 416.920(a)(4)(i), (ii), (iv), (v). If the claimant has an impairment that meets the requirements of step 3 or is incapable of adjusting to other work under step 5, then he is disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), (v); 416.920(a)(4)(iii), (v). The claimant has the burden of proof at steps 1 to 4. *See Mandrell v. Kijakazi*, 25 F.4th 514, 516 (7th Cir. 2022). At step 5, the burden

of proof shifts to the Commissioner of Social Security to show that the claimant can adjust to other work existing in "a significant number of jobs…in the national economy." *See Young*, 362 F.3d at 1000; *accord Brace v. Saul*, 970 F.3d 818, 820 (7th Cir. 2020).

At step 3, most mental impairment listings require two "marked" limitations or one "extreme" limitation under the "paragraph B" criteria, which include: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. *See Thompson v. Saul*, 470 F. Supp. 3d 909, 912 (E.D. Wisc. 2020). Impairments and related symptoms may cause physical and mental limitations that affect the ability to work. *See* 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). Steps 4 and 5 assess the most a claimant can do at work, despite those limitations. *See* 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1); *accord* SSR 96-8p, 1996 WL 374184, *2; *Clifford v. Apfel*, 227 F.3d 863, 872-73 n. 7 (7th Cir. 2000). In this way, an RFC assesses the ability to perform sustained physical and mental activities in a work setting on a regular and continuing basis, *i.e.*, for eight hours a day and five days a week or an equivalent schedule. *See Tenhove v. Colvin*, 97 F. Supp. 2d 557, 568 (E.D. Wisc. 2013); SSR 96-8p, 1996 WL 374184, *2; *accord Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). An RFC must be based on the relevant medical and other evidence of record. *See* 20 C.F.R. §§ 404.1545(a)(3); 416.945(a)(3); SSR 96-8p, 1996 WL 374184, *2-3, 5.

When completing an RFC, the ALJ considers all impairments, including nonsevere impairments, and the claimant's ability to meet physical, mental, sensory, and other work requirements. *See* 20 C.F.R. §§ 404.1545(a)(2), (4); 416.945(a)(2), (4); *see also Alesia v. Astrue*, 789 F. Supp. 2d 921, 933 (N.D. Ill. 2011) ("[T]he ALJ must consider the combined effect of

all impairments, 'even those that would not be considered severe in isolation.' "). "An impairment or combination of impairments is not severe if it does not significantly limit [the] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1522(a); 416.922(a). A limited ability to do mental activities, such as understand, remember, carry out instructions, and respond to supervision, co-workers, and work pressures, may reduce the ability to do "other work" at step 5. *See* 20 C.F.R. §§ 404.1545(c); 416.945(c).

## IV.   The ALJ's Decision[3]

The ALJ assessed Plaintiff's alleged disability under the five-step sequential evaluation process. At step one, the ALJ determined Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of July 28, 2020. (Doc. 11-2, pg. 32). At step two, the ALJ found that Plaintiff has the following severe impairments:

> "[D]egenerative changes of the right knee, left shoulder labral repair, obesity, and schizoaffective disorder."

(*Id.*). Additionally, the ALJ found Plaintiff has the following nonsevere impairments:

> [B]enign mass excised from left index finger; Dupuytren's contracture left index finger; plantar fasciitis; COPD; sleep disorder breathing; overactive bladder and stress incontinence; peripheral neuropathy; migraines; history of degenerative changes of the spine; jerky body movements; restless leg syndrome; chronic bilateral otitis media; left deviated septum; cataracts; grief; and history of trauma.

(*Id.*). The ALJ found these impairments were nonsevere because the medical record did not show that they had more than a minimal effect on the claimant's ability to perform

---

[3]As with the discussion of the administrative hearing, the Court generally limits its discussion of the ALJ's decision to those portions that are challenged by Plaintiff in her brief.

basic work activities, were generally well-managed with conservative treatment, were not discussed as a significant source of functional limitation in the record, and/or were only indicated by Plaintiff's allegations regarding symptomatology. (Doc. 11-2, pg. 33).

At step three, the ALJ found that Plaintiff does not have any impairments or combination of impairments that are considered conclusively disabling. (Doc. 11-2, pgs. 33-34). Before proceeding to step four, the ALJ assessed Plaintiff's residual functional capacity ("RFC"), finding as follows:

> [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except as follows. The claimant can never climb ladders, ropes, and scaffolds. She can occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl. She can occasionally reach overhead bilaterally. She can have no more than occasional exposure to hazards. The claimant can understand, remember, and apply simple and detailed but not complex information. She can carry out simple tasks, maintaining ordinary pace and persistence. She can make simple decisions and manage ordinary changes in this routine work setting. She can maintain occasional interaction with coworkers and the public and tolerate ordinary supervision.

(Doc. 11-2, pg. 34).

At step four, the ALJ found Plaintiff did not have any past relevant work. (Doc. 11-2, pg. 39). At step five, the ALJ found Plaintiff was not disabled because she had the RFC to perform other jobs that exist in significant numbers in the national economy. (*Id*.).

## V.   Issues Raised by Plaintiff

Plaintiff raises the following issues:

1. The residual functional capacity is not supported by substantial evidence.

2. The Administrative Law Judge failed to properly assess the opinions and/or findings of the state agency physicians.

3. The credibility[4] determination is flawed and not supported by substantial evidence.

## VI. Analysis

The Court's review of the ALJ's decision is "extremely limited" and "very deferential." *See* 42 U.S.C. § 405(g); *Jarnutowski v. Kijakazi*, 48 F.4th 769, 773 (7th Cir. 2022) (quoting *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008)). Findings of fact, supported by substantial evidence, are conclusive. *See* 42 U.S.C. § 405(g); *accord Clifford*, 227 F.3d at 869. The Court will reverse the ALJ's decision only if the findings of fact were not supported by substantial evidence or the ALJ applied the wrong legal standard. *See Clifford*, 227 F.3d at 869; *accord Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *See Clifford*, 227 F.3d at 869 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *accord Jarnutowski*, 48 F.4th at 773. If reasonable minds could differ about the alleged disability and the ALJ's decision is supported by substantial evidence, then the Court will affirm the ALJ. *See Jarnutowski*, 48 F.4th at 773 (quoting *Elder*, 529 F.3d at 413). The Court reviews the entire record, but does not reweigh the evidence, resolve conflicts, decide credibility, or substitute its judgment for that of the ALJ. *See Clifford*, 227 F.3d at 869; *accord Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). However, an

---

[4] Plaintiff raises arguments regarding the ALJ's "credibility" determination. The Court will refer to this as the ALJ's subjective symptom evaluation in accordance with a 2016 policy interpretation by the Social Security Administration. The 2016 policy interpretation eliminates the term "credibility" from the Administration's sub-regulatory policies to "clarify that subjective symptom evaluation is not an examination of the individual's character." *Id.* at * 1.

ALJ must build a logical bridge between the evidence and the conclusions. *See Jarnutowski*, 48 F.4th at 773 (quoting *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021)).

In the instant case, Plaintiff contends the RFC is not supported by substantial evidence because the ALJ failed to adequately articulate the reasons and/or evidence supporting her RFC assessment. Next, Plaintiff argues that the ALJ failed to properly consider the opinions and/or findings of the state agency physicians. Finally, Plaintiff contends that the ALJ's subjective symptom analysis is flawed and not supported by substantial evidence.

### A. The Residual Functional Capacity Assessment

Plaintiff contends that, although the ALJ summarized some of the medical evidence, she failed to explain how specific evidence supports the RFC. But, as the Seventh Circuit has made clear, ALJs are "subject to only the most minimal of articulation requirements" and "need not address every piece or category of evidence identified by a claimant, fully summarize the record, or cite support for every proposition or chain of reasoning." *Warnell v. O'Malley*, 97 F.4th 1050, 1053 (7th Cir. 2024). "All we require is that ALJs provide an explanation for how the evidence leads to their conclusions that is sufficient to allow us, as a reviewing court, to assess the validity of the agency's ultimate findings and afford the appellant meaningful judicial review." *Id.* at 1054.

In the instant case, the ALJ extensively discussed the evidence relevant to Plaintiff's alleged physical and mental impairments. (Doc. 11-2, pgs. 33-37). She then explained how the relevant evidence led to her conclusions. (Doc. 11-2, pgs. 38-40). For instance, the ALJ discussed the treatment records pertaining to Plaintiff's left shoulder

injury (Doc. 11-2, pgs. 35-37), right knee injury (Doc. 11-2, pgs. 35-36), back pain (Doc. 11-2, pgs. 36-37), use of a cane (Doc. 11-2, pgs. 36-37), obesity (Doc. 11-2, pgs. 35-37), and breathing issues (Doc. 11-2, pg. 37). As to the shoulder injury, the ALJ noted that Plaintiff's treating surgeon released her to work without restrictions in April 2021, with Plaintiff stating that she felt "very good" with only "mild symptoms. (Doc. 11-2, pg. 36). At that time, the ALJ noted, Plaintiff reported she was able to "carry heavy items without difficulty" and work as a delivery driver. (Doc. 11-2, pg. 38). The ALJ also discussed Plaintiff's consultative examination in August 2022 where the examiner noted Plaintiff had full strength in both shoulders, full shoulder range of motion, normal extremities, and normal muscle testing at 5/5. (Doc. 11-2, pg. 36). Then, after completing an equally thorough analysis of the evidence pertaining to Plaintiff's other alleged physical symptoms, the ALJ stated:

> The undersigned has considered all the claimant's impairments, including degenerative changes of the right knee, left shoulder labral repair, obesity, and schizoaffective disorder. After review of the entire record, the undersigned finds the claimant is able to perform light work, with additional limitations. The ability to perform light work is supported by overall conservative treatment, improvement since surgery, largely unremarkable and mild objective exam finding since surgeries, and the claimant's wide range of daily activity including ability for work activity such as delivering pizza.

> The claimant is further limited in that she can never climb ladders, ropes, and scaffolds, due to knee and shoulder issues, and she can only occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl. The claimant is able to occasionally reach overhead bilaterally; despite her subjective testimony about difficulty reaching overhead, notably the record fails to contain continued objective findings of reduced upper extremity strength and/or motion since surgery. The claimant can have no more than occasional exposure to hazards to account for alleged fatigue and daytime tiredness. Notably, the record fails to support a diagnosis of sleep apnea

supported by sleep testing.

(Doc. 11-2, pg. 38).

Thus, as to Plaintiff's physical work abilities, the ALJ sufficiently articulated the basis for the RFC. The Court also rejects the contention that the RFC restriction to occasional overhead reaching could not possibly pertain to the left shoulder impairment because it was imposed "bilaterally." (Doc. 19, pgs. 4-5). Essentially, Plaintiff contends that because the ALJ included a restriction as to *both* arms – essentially finding that Plaintiff is *more* impaired than provided for in the record – remand is required. But if this was an error, it is one that benefitted Plaintiff and is not cause for remand. *See* e.g., *Orienti v. Astrue*, 958 F. Supp. 2d 961, 968 (N.D. Ill. 2013) (an error in the RFC that benefits the Plaintiff is no cause for complaint); *Barker v. Saul*, No. 20-CV-38, 2021 WL 856938 (E.D. Wis. Mar. 8, 2021) (error finding the Plaintiff more impaired than that which the medical record indicates is "obviously" harmless).

The ALJ's analysis of the Plaintiff's mental abilities and the corresponding RFC was also sufficient. The ALJ thoroughly discussed the record as it pertains to Plaintiff's mental abilities. (Doc. 11-2, pgs. 33-34, 37-38). The ALJ discussed Plaintiff's schizoaffective disorder symptoms, including intermittent auditory and visual hallucinations. However, the ALJ noted that, despite these symptoms, Plaintiff's medical records (as well as her August 2022 consultative examination) consistently reflected normal memory, attention, and concentration; coherent and appropriate thought process; full range of affect; and fair to appropriate judgment. (Doc. 11-2, pg. 37). The ALJ also noted that Plaintiff's medications were effective at minimizing her symptoms when taken

consistently. (*Id*).

Additionally, the ALJ partially relied on the state agency reviewing psychologists' findings that Plaintiff could perform multiple step productive activity with modified social demands. (Doc. 11-2, pg. 38). The ALJ found these assessments to be "largely persuasive" because they were "supported by the evidence in part" and because they were "largely consistent with the record." Further, as noted by Defendant, the ALJ credited Plaintiff's subjective complaints, finding her more limited than the reviewing psychologists and imposing additional restrictions. (Doc. 11-2, pgs. 38-39).

Plaintiff claims the ALJ failed to include any discussion of Plaintiff's mood issues and hallucinations. (Doc. 19, pgs. 7-8). This is incorrect. The ALJ discussed Plaintiff's mood issues and hallucinations and cited to the record. (Doc. 11-2, pgs. 33-34, 37). The ALJ weighed this evidence against evidence demonstrating that (1) Plaintiff typically presented with normal memory, attention, and concentration; (2) Plaintiff exhibited coherent and appropriate thought process; and (3) Plaintiff's hallucinations improve with medication. (Doc. 11-2, pg. 37). The ALJ also noted that "since the alleged onset date the claimant has worked, alleged on-the-job injury, and filed two worker's compensation claims." (Doc. 11-2, pg. 38).[5]

In summary, a review of the ALJ's decision and the evidence shows that the ALJ met, and even exceeded, the minimal articulation requirements. Thus, remand is not

---

[5] Plaintiff also claims the ALJ improperly made independent medical findings and drew inferences from the medical reports. (Doc. 19, pg. 8). The ALJ's decision does not support this allegation. The ALJ weighed all evidence, noting evidence that supports her decision and evidence that refutes her decision. This is exactly what an ALJ is required to do. *See Bakke v. Kijakazi*, 62 F.4th 1061, 1069 (7th Cir. 2023); *Weber v. Kijakazi*, No. 20-2990, 2021 WL 3671235, at *4 (7th Cir. Aug. 19, 2021).

warranted on this issue.

## B. Consideration of State Agency Opinions and/or Findings

Plaintiff contends the ALJ improperly evaluated the "medical opinions" in evaluating Plaintiff's work-related abilities. (Doc. 19, pgs. 5-9). The ALJ considered the prior administrative medical findings of state agency reviewing psychologists M. W. DiFonso, Psy. D. (opinion dated September 2020), and Richard J. Hamersma, Ph. D (opinion dated October 2021).[6] In September 2020, Dr. DiFonso concluded Plaintiff's "cognitive and attentional skills [were] intact and adequate for simple one-two step as well as multiple step tasks." (Doc. 11-3, pg. 83). He also found Plaintiff's interpersonal skills were moderately limited by her depressive symptoms; Plaintiff's adaptive skills were within normal limits; and Plaintiff was capable of multiple step productive activity with modified social demand. (*Id*). In October 2021, Dr. Hamersma affirmed Dr. DiFonso's findings.

---

[6] State agency reviewing physicians Frank Mikell, M.D., and Kathryn Schutt-Kinnear, M.D., both found insufficient evidence to assess Plaintiff's claim, noting that she had not attended the scheduled consultative examination or submitted imaging of her knees at the time of their review. (Doc. 11-3, pgs. 77, 96). The ALJ found that Dr. Mikell and Dr. Schutt-Kinnear's opinions were "unpersuasive, as they are not supported by the evidence and they are inconsistent with the record." (Doc. 11-2, pg. 39). The ALJ also explained that "[s]ubsequent medical evidence submitted at the hearing level, as well as claimant's hearing testimony about her ailments, demonstrates she is more limited physically and that she has severe physical impairments." (*Id*). Plaintiff contends that the "ALJ did not analyze this opinion evidence as required by 20 U.S.C. § 404.1520 [*sic*]." (Doc. 19, pg. 7). The Court finds this perfunctory and undeveloped argument is waived. *Rock Hemp Corp. v. Dunn*, 51 F.4th 693, 704 (7th Cir. 2022) (perfunctory and undeveloped arguments, as well as arguments that are unsupported by pertinent authority, are waived."). Further, even if this argument was not waived, Plaintiff has not established error as to this issue. The ALJ's analysis is governed by 20 C.F.R. § 416.920(c), which requires the ALJ to explain how he or she considered the supportability and consistency factors when evaluating the persuasiveness of medical opinions or prior administrative medical findings. The ALJ complied with this requirement.

As to the consultants' prior administrative findings, the ALJ concluded as follows:

> [The findings are] largely persuasive, as they are supported by the evidence in part and they are largely consistent with the record. In general, the record supports the claimant can perform simple work, and that she has moderate social limitations for the reasons discussed, including her ability to deliver pizzas and drive. However, the undersigned observes the state agency determination with regard to social interaction, as it is vague and does not provide a functional analysis of what the claimant can and cannot do.

(Doc. 11-2, pg. 38).

Because Plaintiff filed her application on or after March 27, 2017, the ALJ applied a new set of regulations for evaluating medical evidence that differs substantially from prior regulations. *See, e.g.*, 20 C.F.R. § 416.920c (2017) (explaining how an adjudicator considers medical opinions for claims filed on or after March 27, 2017). The revised regulations require an ALJ to consider the persuasiveness of the medical opinion(s) or prior administrative medical finding(s) using the following five factors: (1) supportability, (2) consistency, (3) relationship with the claimant, (4) specialization, and (5) other factors. *See* 20 C.F.R. § 416.920c(a)-(c) (2017). The most important factors are supportability and consistency, and the ALJ must "explain how [he] considered the supportability and consistency factors for a medical source's medical opinions ... in [the] determination or decision." 20 C.F.R. § 416.920(b)(2).

Clearly, the ALJ considered consistency and supportability, *i.e.*, the two most important factors that she was required consider under the revised regulations when evaluating the persuasiveness the consultants' findings. The Seventh Circuit has held that an ALJ's decision to credit the opinions or findings of state agency consulting physicians must stand so long as the ALJ "examines the appropriate factors under the agency

regulations and minimally articulates its reasoning for crediting the opinions of the non-treating agency medical experts." *Crowell v. Kijakazi*, 72 F.4th 810, 816 (7th Cir. 2023). *See also Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) "[i]f the ALJ discounts the physician's opinion after considering [the required] factors, we must allow that decision to stand so long as the ALJ "minimally articulate[d]" his reasons—a very deferential standard that we have, in fact, deemed 'lax.' " (quoting *Berger v. Astrue,* 516 F.3d 539, 545 (7th Cir. 2008). Here, the ALJ has met the minimum articulation standard regarding the two factors she was required to discuss.

Further, the Court notes that the ALJ restricted Plaintiff to carrying out simple tasks, making simple decisions, a routine work setting, and occasional interaction with coworkers and the public. (Doc. 11-2, pg. 34). These limitations, which are beyond what the state agency consultants proposed, demonstrate the ALJ carefully considered the evidence. *See Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) (an accommodation that is "more limiting than that of any state agency doctor or psychologist, illustrat[es] reasoned consideration given to the evidence."). *See also Tutwiler v. Kijakazi*, 87 F.4th 853 (7th Cir. 2023) ("The ALJ's careful consideration is shown by the fact that he departed from the residual functional capacity recommended by the state agency physicians who evaluated [the plaintiff]").

Plaintiff also contends the ALJ's analysis of the consulting psychologists' findings was conclusory and perfunctory. (Doc. 19, pg. 6). This argument is easily refuted. An ALJ's decision is to be read as a whole. *See Winsted v. Berryhill*, 923 F.3d 472, 478 (7th Cir. 2019) ("The court applies a common-sense reading to the entirety of an ALJ's

decision"). "An ALJ need not rehash every detail each time he states conclusions on various subjects." *Gedatus v. Saul*, 994 F.3d 893, 903 (7th Cir. 2021). *See also Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004) ("The ALJ need not repeat analyses that are relevant to multiple parts of his decision. Because it is proper to read the ALJ's decision as a whole, and because it would be a needless formality to have the ALJ repeat substantially similar factual analyses at both steps three and five[.]"). Here, as noted in the Defendant's brief, the ALJ included discussion regarding Plaintiff's largely normal mental status examination findings, improved hallucinations with treatment, and ability to work several jobs elsewhere in her decision. This discussion supports the ALJ's conclusions regarding Dr. DiFonso's and Dr. Hamersma's findings.

Finally,[7] Plaintiff contends the findings of the psychologists, "who reviewed the file at the initial and reconsideration levels" and "[did] not consider the subsequent medical evidence in the file," are not "probative of anything after the date they were executed." (Doc. 19, pg. 5). In support of this argument, Plaintiff cites to *Goins v. Colvin*, 764 F.3d 677 (7th Cir. 2014). *Goins* concerned an ALJ who relied on outdated opinions of consulting physicians over more recent medical evidence which indicated that the claimant's condition was deteriorating. *See Goins*, 764 F.3d at 677 (ALJ erred in her

---

[7] Plaintiff also criticizes the psychologists' findings, claiming they failed to consider her hallucinations, racing thoughts, or her PHQ-2 and PHQ-9 scores. (Doc. 19, pg. 7). This is refuted by the record. First, as Plaintiff notes earlier in her briefing, Dr. DiFonso "noted [a] PHQ-9 score of 6 and [a] PHQ-2 score of 2." (Doc. 19, pg. 6) (citing Doc. 11-3, pg. 97). Additionally, both psychologists noted Plaintiff was diagnosed with "paranoid schizophrenia, schizoaffective [disorder], depressive type. (Doc. 11-3, pgs. 78, 97-99). They also noted that her treatment records indicated her attention and concentration are intact and that she is "cooperative, receptive, stable mood, appropriate speech, appropriate thought content, no SI/HI, fair insight, appropriate judgment, [and] fair fund of knowledge." (Doc. 11-3, pgs. 78, 97).

"uncritical acceptance of the consulting physicians' conclusions" when they "had not been shown the report of the 2010 MRI" which "show[ed] a worsening" of plaintiff's condition). The instant case is easily distinguishable. Here, Plaintiff does not identify a later-in-time record indicating that Plaintiff's condition had declined between the findings relied on by the ALJ and the ALJ's decision. Absent a subsequent record that would have altered the reviewing psychologists' findings, the ALJ's reliance on those findings does not warrant remand. *See Baptist v. Kijakazi*, 74 F.4th 437, 442 (7th Cir. 2023), reh'g denied, No. 22-2281, 2023 WL 6294252 (7th Cir. Sept. 27, 2023) (remand not required because there was no indication that subsequent records would have altered the state agency consultants' earlier RFC findings); *Bakke v. Kijakazi*, 62 F.4th 1061, 1067 (7th Cir. 2023) (an ALJ may rely on older assessments when new tests do not necessarily undermine the previous medical conclusions) (citing *Pavlicek v. Saul*, 994 F.3d 777, 784 (7th Cir. 2021)).

### C. The ALJ's Evaluation of Plaintiff's Subjective Symptoms

The ALJ found that the Plaintiff's subjective symptoms were not fully supported by the record. (Doc. 11-2, pg. 35). Plaintiff challenges this finding arguing that it is not supported by substantial evidence. (Doc. 19).

A mere diagnosis of an impairment does not typically indicate a disabling condition. *See, e.g., Thompson v. Colvin*, 575 F. App'x 668, 677 (7th Cir. 2014). Nor are "[a] claimant's [subjective symptoms], taken alone, [] conclusive of a disability." *Zoch v. Saul*, 981 F.3d 597, 601 (7th Cir. 2020) (citing 42 U.S.C. § 423(d)(5)(A)). A claimant must show disabling symptoms. *Durham v. Kijakazi*, 53 F.4th 1089, 1096 (7th Cir. 2022). When

28

assessing a claimant's subjective symptom allegations, an ALJ considers several factors, including the objective medical evidence, the claimant's daily activities, the claimant's level of pain or symptoms, aggravating factors, medication, course of treatment, and functional limitations." 20 CFR 416.929(c). "As long as an ALJ gives specific reasons supported by the record, we will not overturn [this] determination unless it is patently wrong." *Grotts v. Kijakazi*, 27 F.4th 1273, 1279 (7th Cir. 2022). *See also Jones v. Astrue,* 623 F.3d 1155, 1160 (7th Cir. 2010) (particular deference is applied to the ALJ's subjective symptom determination, asking whether under a commonsense reading that aspect of the decision is "patently wrong.").

The ALJ's decision meets this standard. The ALJ discussed Plaintiff's reports of her symptoms and treatments. (Doc. 11-2, pgs. 35-36). Then, using applicable regulatory factors, the ALJ explained why Plaintiff's subjective symptoms were not entirely consistent with the medical evidence and other evidence in the record. Plaintiff claims the "ALJ disbelieved [Plaintiff's] testimony because no medical evidence supported such a limitation." (Doc. 19, pg. 13). Plaintiff is correct to note that an ALJ may not reject a claimant's subjective complaints just because there are no objective medical corroborations, *see Carradine v. Barnhart,* 360 F.3d 751, 753 (7th Cir. 2004), but that did not happen here. The ALJ discussed the objective medical evidence, as well as Plaintiff's contemporaneous reports to providers, daily activities, prior ability to work, and treatment history, and she explained why that evidence was not entirely consistent with Plaintiff's subjective symptoms. (Doc. 11-2, pgs. 35-38). In addition, the Court notes that the ALJ credited some of Plaintiff's subjective symptoms and imposed restrictions not

recommended by any medical source in the record. Thus, considering the ALJ's decision as a whole, the Court cannot conclude that the ALJ's subjective symptom determination was patently wrong. See e.g., *Schmidt v. Astrue*, 496 F.3d 833, 843–44 (7th Cir. 2007) (upholding subjective symptom decision when ALJ considered testimony, normal examination findings, and daily activities in addition to objective medical tests); *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015) (upholding subjective symptom decision where the ALJ "discussed various inconsistencies between [Plaintiff's] alleged symptoms and the other evidence."); *Parker v. Colvin*, 660 F. App'x 478, 483 (7th Cir. 2016) ("we cannot say that the ALJ's credibility determination is 'patently wrong,' especially considering that he imposed a litany of functional limitations, not a single one of them recommended by a doctor involved in the case.").

### VII.   Conclusion

For these reasons, the Court **AFFIRMS** the final agency decision of Defendant. The Clerk of the Court is **DIRECTED** to enter judgment for Defendant and against Plaintiff.

**SO ORDERED.**

Dated: September 9, 2024

_____
DAVID W. DUGAN
United States District Judge